MILLER *v.* DETROIT UNITED RAILWAY.

1. STREET RAILWAYS—CROSSING ACCIDENT—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT.

In an action against a street car company for personal injuries and also for injuries to plaintiff's automobile, caused by a collision with defendant's street car, where plaintiff's testimony was contradictory, and the uncontradicted testimony of defendant's witnesses showed that plaintiff was guilty of contributory negligence as a matter of law, the court below was in error in refusing defendant's motion for a directed verdict in its favor.

2. NEW TRIAL—EVIDENCE—GREAT WEIGHT OF EVIDENCE.

Where the verdict was contrary to the great weight of the evidence, the court below should have granted defendant's motion for a new trial.

Error to Wayne; Mandell, J. Submitted January 23, 1918. (Docket No. 170.) Decided March 27, 1918.

Case by George W. Miller against the Detroit United Railway for injuries to himself and his automobile. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*Corliss, Leete & Moody* (*Thomas T. Leete, Jr.,* of counsel), for appellant.

*Baubie & Baubie,* for appellee.

STONE, J.   Plaintiff recovered a judgment for $530.15 damages for alleged personal injuries, and also for damages to his Wood electric automobile, received in a collision with one of the street cars of the defendant on October 16, 1915.   The negligence complained of was excessive speed, want of control of car, and absence of signals.   The plaintiff had lived in Detroit for 17 years, had owned 7 electric cars, had been accustomed to driving them, and was well acquainted with the streets of the city, and had been in the habit of crossing railway intersections.

He was driving his automobile north on McDougall avenue about 5:30 p. m. and approached Waterloo street, upon which defendant operates its street cars, all of which travel in an easterly direction.

The testimony of the plaintiff, in many material particulars, was contradictory and irreconcilable as found in this record, as will appear by the following excerpts taken therefrom:

"On the 16th day of October, about 5:30, I was driving up McDougall avenue, and as we came near the railroad track on Waterloo street, I went slower and put on the brakes, and when the car was within, say 40 feet, I looked up the track, and I saw nothing coming in the way of a street car.

"Q. How far could you see up the track?

"A. About 125 feet.

"Q. Did you hear any noise at that time of the approaching car?

"A. No, I heard no noise or bell.

"Q. What did you do then?

"A. I, of course, cut down my speed.

"Q. How fast were you going?

"A. Not more than ten or eleven or twelve miles.

"Q. At the time you first looked?

"A. Yes, sir.

"*Q.* What was your rate of speed after that?

"*A.* I cut my car down probably to seven or eight miles as I approached the track.

"*Q.* What did you have, or what did you do in order to do that?

"*A.* I put my foot on the brake.

"*Q.* Then what happened; you went along at the same rate of speed?

"*A.* I looked up and saw.

"*Q.* How far were you from the tracks when you looked the second time?

"*A.* I should say I was about 18 or 20 feet; I could not give the exact distance.

"*Q.* Did you notice the car?

"*A.* I saw a street car coming then very rapidly.

"*Q.* What did you notice about the car?

"*A.* I noticed it was coming very fast and jumped up and down pretty lively, and I saw something had to be done quick.

"*Q.* Could you have stopped your car?

"*A.* I could not stop it without getting killed.

"*Q.* Although going seven or eight miles an hour * * * what did you do?

"*A.* I saw there was only one thing to do, turn to the right and go over the street car (track?) or be crushed.

"*Q.* What was immediately to your right?

"*A.* A telegraph pole, very large telegraph pole, * * * I had to avoid that.

"*Q.* Could you tell the court and jury what the distance was between the curb there, and the railroad track at your right?

"*A.* Ten feet from the curb to the first track—to the first rail. The telegraph pole was right on the corner. I turned with the car, the only thing that any man on earth could do to save himself, and he struck me, as near as I can explain, a sort of quartering near the hinges, and the car was hit and I was struck on my head with glass."

Plaintiff then testified that it was necessary to have the machine repaired at an expense of five or six hundred dollars. The bill for repairs was received in evidence, and defendant admitted it was a reasonable charge.

The injury to plaintiff's person was inconsiderable. On cross-examination the plaintiff testified:

"That electric car has four forward speeds.   *   *   *

"Q.  After you had looked the last time, and while approaching the street car track previous to turning, at what speed were you running?

"A.  When I started to turn the car, or before I turned it probably not faster than seven miles an hour.   *   *   *

"Q.  So in what distance, under the conditions as they were at that time, to your best judgment, would you have been able to have stopped the car running at a speed of 7 or 8 miles per hour?

"A.  Well, it is impossible for me to answer the question only in this way:  I use both brakes; I might possibly have been able to stop the car going at that speed in 10 feet or 8 feet.

"Q.  Eight feet or ten feet using both brakes?

"A.  I don't know exactly; I don't know as I could."

He was then asked if he could have stopped it within 10 feet or 12 feet or 16 feet or 18 feet, and he answered he could not tell.

Cross-examination continuing:

"Q.  The front of your car was from 18 to 20 feet from the street car track when you saw the car the last time?

"A.  When I saw the car the first time; I never saw it but once.

"Q.  You saw it only once?

"A.  I looked up and saw it when I was *forty* feet away.

"Q.  In the neighborhood of *forty* feet?

"A.  Yes, sir.

"Q.  When you approached the track when away a distance of 18 or 20 feet away from the car track, you looked again and saw the car approaching again at that time?

"A.  Yes, sir.  I noticed that the car was approaching very rapidly.  I could not give the exact distance it was away when I first saw it; it would be impossible for me to tell you."

On re-direct examination plaintiff further testified:

"When I got within 18 or 20 feet from the track, I saw this car to my left. It is almost impossible for me to tell positively, whether or not, at the speed I was going, seven or eight miles an hour, I could stop that car in a distance of 18 or 20 feet, when I first saw the car before reaching the track."

Edward Voss and Edward Whitstock, two witnesses produced by the plaintiff, were driving another automobile, coming south on McDougall avenue at the time of this accident. They saw the street car coming, and stopped their car on the north side of Waterloo street, to allow the street car to pass. Voss testified, on cross-examination, that he was accustomed to operating electric automobiles:

"I have been at the Anderson electric; that is about the same thing. Four speeds. The same as Woods. I could not tell how weight compares. In size they are about alike, about the same thing. Both have batteries the same.

"*Q.* In that electric car, an electric car running at the speed of seven or eight miles an hour, on a good pavement, asphalt pavement or brick pavement, in what distance could it be stopped?

"*A.* By using all the appliances at seven or eight miles an hour you could stop it in six feet."

Whitstock testified:

"From where I stood, I thought Mr. Miller wanted to cross the track, but when he saw the street car, he wanted to avoid it, and turned around. At the time he turned he was getting on the track. The street car was then about 100 feet from him. I heard no gong or bell. * * * That day that [street] car was driving at the rate of between 20 and 25 miles an hour. When I first saw the car, when the car was 100 feet off, I did not notice any checking of the rate of speed of the car. I noticed the car when it came upon Miller. When Miller's car was struck it was knocked about 40 or 45 feet from where he started to cross the track, down Waterloo street."

Upon the defense, the conductor and motorman oper-

ating the street car, and three disinterested eyewitnesses, all of whom were on the street car, gave testimony tending to show that the street car was being operated at about 12 miles per hour with the power shut off, as it approached the intersection of McDougall avenue; that the automobile came up the street at the speed of at least 20 miles per hour, and did not change its speed, but ran directly in front of the street car; and that when the street car was near the west line of McDougall avenue, the automobile was 75 feet south of the street railway track. Several of these witnesses testified to the ringing of the gong by the motorman from the time it was 100 feet away from the corner and his prompt action in attempting to stop the car. Other of defendant's witnesses on the street car testified that they saw the automobile plainly when it was 30 feet away from Waterloo street. The crossing was considered a dangerous one, because of a building which stood near the southwest corner of the intersection. There was a conflict in the evidence as to the distance the street car ran before stopping after the collision, varying in distance from 5 to 40 feet.

Defendant requested the court to charge the jury that the plaintiff was guilty of contributory negligence and could not recover. This was refused, and the questions of the negligence of the defendant, and the contributory negligence of the plaintiff were submitted to the jury.

There was a motion for a new trial based upon several grounds, among which was this, that the verdict was contrary to the weight of the evidence. This motion was denied and exceptions were duly entered.

In this court the defendant, under proper assignments of error, claimed that a verdict should have been directed in its favor, under the testimony, on the ground of contributory negligence of the plaintiff; that no negligence on the part of the defendant was shown;

and that the verdict of the jury was, in any event, contrary to the weight of evidence.

In our opinion the uncontradicted testimony shows that the plaintiff was guilty of contributory negligence as matter of law. His own testimony was so contradictory, and irreconcilable, that it furnishes but little aid in disposing of the case. While in his declaration he claimed that when he slackened the speed of his automobile at a distance of about 25 feet from the track, he looked and saw a car coming at a "terrific speed"; at the trial he testified first, that when he was 40 feet from the track he saw no street car coming, that he then proceeded until he was about 18 or 20 feet from the track, and at that point saw the car coming rapidly. On cross-examination he distinctly testified that "I looked up and saw it when I was 40 feet away." After testifying that he could probably have stopped the automobile in "10 feet or 8 feet," he then gets into "doubting castle," and does not know as he could have stopped it in 18 feet.

We are satisfied from the evidence that the car could have been stopped in from 6 to 10 feet, in the exercise of reasonable care. He testified that the car was in perfect condition, and he was accustomed to running it. The following cases, with others, are cited by appellant upon this branch of the case: *Colborne* v. *Railway,* 177 Mich. 139, 150, and cases cited; *Borschall* v. *Railway,* 115 Mich. 473. As was said in the last cited case:

"If he saw the car coming, and then attempted to cross the track, he took his chances of being injured and cannot complain."

We are also of the opinion that the verdict was contrary to the great weight of the evidence.

For these reasons the judgment of the circuit court is reversed, with costs to the appellant, and no new trial will be granted.

OSTRANDER, C. J., and STEERE, BROOKE, and FEL-
LOWS, JJ., concurred with STONE, J.

MOORE, J. I concur because the verdict is against
the weight of the evidence.

BIRD, J., concurred with MOORE, J. KUHN, J., did
not sit.